**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                    )
                                                    )
**UNITED STATES OF AMERICA**          )
                                                    )
      **v.**                                )         **Criminal Case No. 08-334 (RCL)**
                                                    )
**CHARLES E. COUGHLIN,**                )
      **Defendant.**                      )
                                                    )
———————————————————————)


**Memorandum Opinion**

Before the Court are several motions that will determine the scope and nature of the defendant's upcoming retrial for making a false claim and theft of public money. The Court has reviewed the parties' motions, the applicable law, and the entire record in this case extensively. Its resolution of these motions is intricate, piecemeal, and not amenable to quick synopsis in this introductory paragraph. Therefore, the Court offers the following explanation of this case's complex factual and procedural background, a summary of the parties' various motions and arguments, and its own explanation of its reasoning in resolving them.

**I.      Facts and Procedural History**

      **a.  Coughlin's September 11th Victim Compensation Fund Claim**

Charles Coughlin, a United States naval officer, was working at the Pentagon on September 11, 2001, when terrorists crashed a hijacked plane into the building just seventy-five feet from his desk. In December 2003, Coughlin submitted a claim to the September 11th Victim Compensation Fund (VCF), which Congress created to compensate people who were injured in

the attack. He claimed that the crash caused the ceiling over his desk to collapse, that flying debris hit him, and that he struck his head while rescuing people at the disaster site.

On January 22, 2004, Coughlin's attorney, Walter Laake, hand-delivered Coughlin's claim application, with an attached cover letter, to the VCF. On February 3, Laake mailed the VCF a corrected version of the cover letter. The January 22nd and February 3rd documents explained Coughlin's claim that his 9/11 injuries caused him severe and permanent disabilities, including neck, head, and upper back pain; restricted range of motion; and weakness and numbness in his left arm and hand. Coughlin said that his injuries prevented him from playing certain sports, and his medical needs forced him to take time off from work. He claimed that he couldn't complete normal household chores like painting, electrical wiring, and installing a patio. Instead, he said, he had to pay others to do them and included a list of ten checks he had written for such replacement services. His application made clear, though, that he wasn't seeking compensation for those replacement services or any other economic damages. Instead, he sought $180,000 in compensation solely "for the personal injuries that he suffered."

Initially, the VCF determined that Coughlin was ineligible for compensation because he hadn't sought medical treatment within the time allowed by the Fund. On February 17, 2004, though, Coughlin appealed that determination, explaining the delay and asking for a waiver of ineligibility that was available to rescue workers. On February 20 and March 9, he submitted additional documentation to support his appeal, including certified medical records and a doctor's report. The VCF then reversed itself and, on April 14, informed Coughlin that he was eligible for a presumed award of $60,000. That award represented zero dollars of economic loss and $60,000 of noneconomic loss. It advised Coughlin that he could either accept that amount or

request an appeal hearing. On April 30, Coughlin's attorney mailed the VCF a letter asking for such a hearing.

At the May 13, 2004 appeal hearing, Coughlin's attorney told the hearing officer that Coughlin had two reasons for seeking review. The $60,000 presumed award for non-economic loss was, he said, "unfair and inadequate and in and of itself would give rise to a request for review." But the presumed award was also an egregious error because it "provided no compensation for economic loss to the Claimant." The attorney acknowledged that the failure to award compensation for economic loss was not the VCF's fault. He explained that "one of the things that we didn't spell out in the initial claim and that the claim evaluator really didn't have before him—and it was an oversight on my part . . . was the fact that there was a past, present, and future loss of earnings component to this claim, which was never even made initially."

To support his appeal, Coughlin submitted ten new exhibits, nine of which addressed his economic loss claim. These included a letter documenting salary he lost from taking off from work for doctor appointments and physical therapy. He also offered thirty-two carbon copies of checks purportedly reflecting payments to others for household chores he could no longer perform himself. Finally, he provided a six-page schedule setting out and totaling his past and future economic claims. The VCF rendered its final decision on June 1, awarding Coughlin $331,034: $151,034 for economic damages and the entire $180,000 he had requested for noneconomic damages for his personal injury.

### b.  The First Trial

A grand jury indicted Coughlin on October 31, 2008, charging that, "[f]rom in or about December 2003, and continuing until in or about June 2004," he "willfully and knowingly devised, and intended to devise, a scheme and artifice to defraud the VCF and to obtain money

by means of false and fraudulent pretenses and representations." Indictment ¶ 6. The indictment alleged that Coughlin submitted false and misleading information about his pre-and post-September 11 medical condition and about his loss of earnings.

The indictment contained five counts of mail fraud in violation of 18 U.S.C. § 1341—one for each letter that Coughlin sent or caused to be sent to the VCF while pursuing his claim. Count One was for the February 3, 2004 version of the cover letter that his attorney originally sent to the VCF on January 22, 2004. Count Two was for his February 17 appeal of the VCF's ineligibility decision. Count Three was for the February 20 letter that contained certified copies of his medical records. Count Four was for the March 9 letter that contained additional exhibits that Coughlin offered to support his rescue activities and physical injuries. Count Five was for his April 30 request for an appeal hearing regarding the amount of the VCF award.

The indictment also included two non-mail-fraud counts. Count Six charged Coughlin with making a false and fraudulent claim in violation of 18 U.S.C. § 287. And Count Seven charged him with theft of public money in violation of 18 U.S.C. § 641.

After a month-long trial, a jury acquitted Coughlin on three of the five mail fraud charges—Counts Two, Three, and Five. It was unable to reach a verdict on the other four counts, and on April 15, 2009, the presiding judge, Honorable Henry Kennedy, granted a mistrial.

### c. The Second Trial

The government sought to retry Coughlin on all of the hung counts. Coughlin objected, invoking a prong of the double jeopardy analysis known as "issue preclusion" or "collateral estoppel." In *Ashe v. Swenson*, the Supreme Court explained that this doctrine bars the government from prosecuting a defendant on a charge that depends on facts that a previous

acquittal on a different charge necessarily decided in the defendant's favor. 397 U.S. 436, 443–44 (1970).

At the time of the April 15 mistrial, the rule in the D.C. Circuit was that *Ashe* didn't bar retrial in a case like Coughlin's. In *United States v. White*, the Circuit held that, where the same jury acquits a defendant on some charges and can't reach a verdict as to others, the acquittals couldn't have been based on a fact upon which the hung counts depended. 936 F.2d 1326, 1329 (D.C. Cir. 1991). Adhering to *White*, Judge Kennedy denied Coughlin's double jeopardy motion. On June 8, 2009, a new trial commenced on the two remaining mail fraud counts, as well as on the false claim and theft counts.

In the middle of the second trial, the Supreme Court decided *Yeager v. United States*, --- U.S. ---, 129 S.Ct. 2360 (June 18, 2009). *Yeager* expressly overruled the decisions of those circuits—including the D.C. Circuit—that had held that a conflict between acquittals and hung counts barred the application of issue preclusion. 129 S.Ct. at 2365 (citing *White*, 936 F.2d 1326). Relying on *Yeager*, Coughlin promptly renewed his motion to bar retrial. He argued that the only disputed issue at the first trial was his fraudulent intent; that by acquitting him on some mail fraud counts, the jury necessarily found that he had acted in good faith when he sought money from the VCF; and that this finding precluded liability on all of the remaining counts. On June 30, Judge Kennedy denied Coughlin's motion, concluding that, although his argument regarding the two mail fraud counts was not frivolous, it failed to satisfy the *Yeager* test. As for the false claim and theft counts, Judge Kennedy held that Coughlin's double jeopardy argument simply lacked legal merit.

Coughlin filed both an appeal of Judge Kennedy's decision as well as an emergency motion to stay the ongoing retrial. A special panel of the D.C. Circuit stayed the trial pending the

appeal. The panel found the stay warranted in light of the "unusual circumstances presented" by *Yeager*'s mid-trial reversal of Circuit precedent, and in light of Judge Kennedy's determination that Coughlin's double jeopardy claim wasn't entirely frivolous. It took the D.C. Circuit a good deal of time to decide the case, and eventually the parties moved for—and Judge Kennedy— granted a mistrial.

### d. The D.C. Circuit's Decision

The D.C. Circuit reversed Judge Kennedy's decision to allow the government to retry Coughlin on the two remaining mail fraud counts and affirmed his decision allowing retrial of the false claim and theft counts. *United States v. Coughlin*, 610 F.3d 89 (D.C. Cir. 2010). Coughlin argues that although the D.C. Circuit's decision allows for retrial on the false claims and theft counts, it greatly restricts the universe of evidence available to the government for reprosecution. *See, e.g.*, Def.'s Resp. Government's Not. Intent 3, Dec. 20, 2010, ECF No. 125. Understanding his arguments and this Court's resolution of them requires familiarity with the D.C. Circuit's decision in this case. Accordingly, this Court proceeds to explain the D.C. Circuit's holding and reasoning in some detail.

The D.C. Circuit first set forth the principles of issue preclusion and then applied them to the hung counts—first the mail fraud counts and then the false claim and theft counts. *Coughlin*, 610 F.3d at 96. The Court explained that the Double Jeopardy Clause bars more than just retrial of acquitted charges. *Id.* It also "'precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial.'" *Id.* (quoting *Yeager*, 129 S.Ct. at 2365– 66). "'To decipher what a jury has necessarily decided,'" *Coughlin* and *Yeager* reaffirmed, "courts should 'examine the record of a prior proceeding, taking into account, the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have

grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Id.* (quoting *Yeager*, 129 S.Ct. at 2367 (quoting *Ashe*, 397 U.S. at 444)).

The first question the Court of Appeals faced was whether, in acquitting Coughlin of three of the five mail fraud counts, the jury "necessarily decided facts in Coughlin's favor that constitute an essential element of the remaining mail fraud counts." *Id.* at 97. It divided its analysis of that question into two parts: "What facts were necessarily decided by the jury's acquittals on Counts Two, Three, and Five? And, do those facts make up an essential element of the remaining counts?" *Id.*

To answer the first question, the Court of Appeals first discussed what the government had to prove to convict Coughlin of mail fraud. *Id.* Mail fraud requires proof of "'(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme.'" *Id.* (quoting *United States v. Reid*, 533 F.2d 1255, 1264 (D.C. Cir. 1976) (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1984). The Court of Appeals went into more detail about the "scheme to defraud" element, making clear that fraudulent intent for mail fraud purposes requires two things: "[the defendant] must both have a fraudulent scheme in mind and intend that the mailing further that scheme." *Id.* at 97–98 (citing 18 U.S.C. § 1341 (providing that the defendant must have "devised or intend[ed] to devise a[ ] scheme" to defraud and must have caused an item to be delivered by mail "for the purpose of executing such scheme")).

The Court of Appeals concluded that "in acquitting Coughlin on three counts of mail fraud, the jury necessarily found that he lacked fraudulent intent when he mailed each of the three letters referenced in those counts." *Id.* at 98. Its reasoning was simple. If Coughlin had a fraudulent scheme in mind at the time of the acquitted mailings, then those mailings would have furthered that scheme, "and it would not have been rational for the jury to have thought

otherwise or to have believed Coughlin thought otherwise." *Id.* at 99. Therefore, the jury necessarily decided that Coughlin didn't have a fraudulent scheme in mind when he mailed the three letters referenced in those counts.

Next, the Court of Appeals asked "whether the jury's finding regarding Coughlin's intent with respect to the acquitted counts precludes proof of an essential element of the two mail fraud counts as to which the jury hung." *Id.* at 100. The acquitted counts were Counts Two, Three, and Five; the hung counts were Counts One and Four. The Court of Appeals reasoned that "if Coughlin had no fraudulent intent on February 17, February 20, or April 30—the dates at issue in the acquitted counts—there was no basis for concluding that he had one in mind on February 3 or March 9 either [(the dates at issue in the hung counts)]." *Id.* The Court of Appeals rejected any "bouncing ball" theory of fraudulent intent that would suggest that "Coughlin harbored a fraudulent scheme on February 3 (Count One), abandoned it on February 17 and 20 (Counts Two and Three), revived it on March 9 (Count 4), and abandoned it again prior to seeking a hearing on April 30 (Count Five)." *Id.* Thus, "in rendering a verdict on the acquitted counts, the jury necessarily decided that Coughlin lacked fraudulent intent during the entire period encompassed by the charged mailings . . . [a]nd because fraudulent intent is an essential element of those counts, the Double Jeopardy Clause bars their retrial." *Id.* (citations omitted).

Having decided that the Double Jeopardy Clause barred retrial of the hung mail fraud counts, the Court of Appeals went on to consider whether it also barred retrial of Counts Six and Seven. *Id.* at 100. The question was whether the jury's finding that Coughlin had no fraudulent mail fraud scheme at any point during the period encompassed by the charged mailings necessarily meant that he lacked fraudulent intent for false claim and theft purposes.

The Court of Appeals acknowledged that both the false claim and theft charges—like the mail fraud charges—require proof of fraudulent intent. The Court made clear, however, that the statutes' fraudulent intent standards differ, noting that for false claims purposes, a claim "'is fraudulent if any part of it is known to be untrue and made . . . with the intent to deceive the governmental agency to which it was submitted." *Id.* at 101 (quoting Trial Tr. 82, Apr. 8, 2009); *id.* at 105 n.7 ("We also note that, unlike the mail fraud statute, there is no 'scheme' requirement in the text of either the false claim or the theft statute.").

Although the jury necessarily decided that Coughlin lacked fraudulent intent for mail fraud purposes before May 2004, the Court of Appeals held that it didn't necessarily decide anything about his state of mind after that date. *Id.* at 101–02. In holding that this Court could retry Coughlin for false claims and theft but not for the hung mail fraud charges, the D.C. Circuit distinguished between the indictment's "broader scheme" and its "narrower scheme." *Id.* at 105–07. Coughlin's indictment would have allowed a jury to convict him for acting on one broad scheme to defraud the government from December 2003 through June 2004. *Id.* at 101–02. That broader scheme would have included each of Coughlin's mailings seeking compensation for his personal injuries as well as his economic damages claims that he only raised after April 30 at his VCF appeal hearing. *Id.* at 106–07. By acquitting him of three of the mail fraud charges, however, the jury necessarily decided that there was a reasonable doubt regarding whether Coughlin had a fraudulent scheme before May. *Id.* at 101.

Although the jury rejected the broader scheme theory of liability, the indictment also made it possible for the jury to convict Coughlin of a narrower scheme to defraud the VCF. *Id.* at 107. The narrower scheme theory concedes that Coughlin was injured on 9/11 but contends that he exaggerated the extent of his injuries and made false claims to the VCF in order to amplify his

economic damages claim. *Id.* The narrower scheme theory only involves claims Coughlin made after April 30 because Coughlin made no economic damages claims before May 2004. *Id.* Thus, April 30 was a date critical to the D.C. Circuit's analysis. It was the date of the last charged— and last acquitted—mailing; it was the latest date that the jury necessarily found Coughlin lacked fraudulent intent; and it marked the end of Coughlin's personal-injury-only VCF claim and the inception of his broader personal-injury-plus-economic-damages VCF claim. Because the jury only acquitted Coughlin of pre-May mail fraud charges, the D.C. Circuit determined that the Double Jeopardy Clause didn't bar another jury from convicting Coughlin under the indictment's narrower scheme for false claims and theft associated with his economic damages claims, which were all made after April 30. *Id.* at 110.

## II.      Analysis

The legal issues this Court must resolve before retrial aren't extremely complicated, but the case's involved procedural history and voluminous motions—which constantly talk past each other and argue on several fronts simultaneously—make accessing them about as difficult as cracking a coconut in a padded cell armed only with a toothpick. To minimize confusion and maximize efficiency, the Court will explain and resolve Coughlin's lynchpin argument first. That resolution will render many of the parties' other arguments moot, and those that remain can be quickly dispatched.

Coughlin argues that although the D.C. Circuit allowed a retrial on the false claims and theft counts, its decision to bar retrial of the hung mail fraud counts drastically limits the universe of evidence the government may use at the upcoming retrial. *See, e.g.*, Not. Intent 3, ECF No. 125.  He's primarily concerned with two very broad categories of evidence that the government used at the first trial: the so-called medical and post-9/11 athletic activities evidence.

*Id.* at 4–32. The Court has included an appendix to this opinion that contains a description of the specific pieces of evidence at issue. For the purposes of the analysis that follows, a more general description of the evidence will suffice.

The medical evidence involves Coughlin's medical records and the testimony of several doctors. The government used this evidence at the first trial to try to prove the broader scheme theory by arguing—among other things—that Coughlin lied about his 9/11 injury, didn't disclose important aspects of his medical records that would have shown that injuries he sustained before 9/11 actually explain his disability, and he lied about his post-9/11 medical condition and future medical needs.

The post-9/11 athletic activities evidence describes Coughlin's successful completion of a sub-four hour marathon shortly after 9/11, his active involvement on two lacrosse teams, and his regular basketball habits. At the first trial, the government introduced this evidence to try to prove—among other things—that Coughlin wasn't really injured on 9/11, that he lied about the severity of his disabilities, and that some of his disabilities could be explained by injuries he sustained playing these sports rather than from the 9/11 events.

Coughlin argues that the Double Jeopardy Clause's issue preclusion doctrine renders that evidence inadmissible. *See, e.g.*, Def.'s Mot. Limine 9, Dec. 1, 2010, ECF No. 121. He points out that this evidence was relevant to the first jury's consideration of the mail fraud charges, and even after evaluating that evidence, the jury acquitted him because it found that he lacked fraudulent intent for mail fraud purposes. *Id.* at 12–14. He argues that in concluding that he lacked that fraudulent intent, the jury necessarily rejected each of the government's arguments that he lied or attempted to deceive the VCF before May. *Id.* at 14. Therefore, it necessarily decided that the government's contentions based on the medical and athletic activities evidence

were meritless. *Id.* To allow it to make those same arguments again, then, would be tantamount to permitting the government to relitigate an issue the first jury necessarily decided in his favor.

If Coughlin is right about that, then the government's case at retrial would be drastically restricted. *See, e.g.*, Def.'s Resp. Government's Supplemental Mot. Seeking Pretrial Evidentiary Rulings 51, March 25, 2011, ECF No. 136 ("The preceding sections figuratively and literally highlights that the 'narrower scheme,' as defined by the Court of Appeals, is indeed quite narrow. It is so narrow that the medical records that the Government seeks to introduce have no relevance to the 'narrower scheme.'"). Every argument that Coughlin exaggerated the severity of his 9/11 injury would automatically be off-limits along with any evidence that the jury might have considered in conjunction with those arguments. Evidence supporting arguments about Coughlin's post-April 30 economic submissions would be inadmissible as well because many of them merely repeated arguments about pre-May behavior that Couglin argues are off-limits. *Id.* at 50–51.

At a January 27, 2011 motions hearing, Judge Kennedy agreed with Coughlin and held that the medical and athletic activities evidence would be inadmissible at the upcoming trial and explained that permitting the government to introduce evidence that tended to show that Coughlin had made false or fraudulent statements before May 2004 would allow it to undermine the first jury's finding that he had no fraudulent intent before that date. Hr'g. Tr. 8, Apr. 7, 2011. The government moved for reconsideration of that decision, and having taken more time to review the parties' arguments, the relevant law, and Judge Kennedy's prior ruling, this Court concludes that it must reconsider the prior ruling.

As the Court will explain at length below, the Double Jeopardy Clause simply doesn't apply to the evidentiary issues Coughlin raises. But even if the Double Jeopardy Clause *did*

apply here, the evidence at issue would still be admissible because Coughlin has failed to "demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Dowling v. United States*, 493 U.S. 342, 350 (1990).

### a. Legal Standard for Motion for Reconsideration

"Although the Federal Rules do not specifically provide for motions for reconsideration in criminal cases, the Supreme Court has recognized . . . the utility of such motions." *United States v. Ferguson*, 574 F. Supp. 2d 111, 113 (D.D.C. 2008); *see also United States v. Dieter*, 429 U.S. 6, 8 (1976) (per curiam) (noting "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors"). Thus, this Court assumes, as it has in the past, that it can consider such a motion in a criminal case. *See United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (citing *United States v. Booker*, 613 F. Supp. 2d 32, 34 (D.D.C.2009) and *Dieter* and *United States v. Healy*, 376 U.S. 75, 78 (1964), as support for the notion that the Court can consider motions for reconsideration in criminal cases)); *Ferguson*, 574 F. Supp. 2d at 113 (proceeding "on the assumption that it may consider" a motion for reconsideration in ruling on government's motion for reconsideration of order dismissing indictment); *United States v. Libby*, 429 F. Supp. 2d 46, 46–47 (D.D.C. 2006) (considering the merits of the government's motion for reconsideration of evidentiary ruling).

In *Libby*, Judge Walton adopted the standard of review for motions for reconsideration filed under Rule 59(e) of the Federal Rules of Civil Procedure as the appropriate standard for motions for reconsideration in criminal cases. *Libby*, 429 F. Supp. 2d at 46–47. Since then, other members of this Court have, in turn, relied upon *Libby* as authority for employing this standard of review in considering their own motions for reconsideration. *See, e.g.*, *Ferguson*, 574 F. Supp.

2d at 113 (adopting the *Libby* standard without comment); *see also Booker*, 613 F. Supp. 2d at 34 (relying on *Libby* and *Ferguson* as authority for the use of this standard).

In the civil context, however, "'[t]he standard of review for interlocutory decisions differs from the standards applied to final judgments under Federal Rules of Civil Procedure 59(e) and 60(b).'" *Sunia*, 643 F. Supp. 2d at 60 (quoting *Williams v. Savage*, 569 F. Supp. 2d 99, 108 (D.D.C. 2008)). "In particular, reconsideration of an interlocutory decision is available under the standard, 'as justice requires.'" *Judicial Watch v. Dep't of Army*, 466 F. Supp. 2d 112, 123 (D.D.C. 2006). As Judge Kennedy's evidentiary rulings on January 27 are interlocutory in nature, and "as the Court's apparent intention in *Libby* was to simply transplant into the criminal context the standard of review for an analogous motion for reconsideration filed in a civil case," *Sunia*, 643 F. Supp. 2d at 60–61, the Court will analyze the pending motions for reconsideration under the Federal Rules' standard for reconsideration of interlocutory orders rather than the standard enunciated in *Libby*. *Id.* at 61.

Federal Rule of Civil Procedure 54(b) "by its terms allow[s] the trial court to modify its earlier [interlocutory] order." *Dellums v. Powell*, 566 F.2d 231, 234 (D.C. Cir. 1977); *see also Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005) ("Rule 54(b) governs reconsideration of orders that do not constitute final judgments in a case."). Although this Rule provides a procedural mechanism for courts to reconsider their prior opinions, the actual language of Rule 54(b) sets forth little guidance as to when such review is appropriate. To fill this gap, courts in this district have held that "relief upon reconsideration . . . pursuant to Rule 54(b) is available 'as justice requires.'" *Hoffman v. District of Columbia*, 681 F. Supp. 2d 86, 90 (D.D.C. 2010) (quoting *Childers v. Slater*, 197 F.R.D. 185, 190 (D.D.C. 2000)). "[A]sking 'what justice requires' amounts to determining, within the court's discretion, whether reconsideration is

necessary under the relevant circumstances." *Cobell*, 355 F. Supp. 2d at 539; *see also United States v. Second Chance Body Armor, Inc.*, 709 F. Supp. 2d 52, 55 (D.D.C. 2006)). The relevant circumstances that may warrant reconsideration include "whether the court 'has patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the court.'" *Ficken v. Golden*, 696 F. Supp. 2d 21, 35 (D.D.C. 2010) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004) (alterations in original); *see also Hoffman*, 681 F. Supp. 2d at 90 (same); *Capitol Justice, LLC v. Wachovia Corp.*, 605 F. Supp. 2d 187, 190 (D.D.C. 2009) (same).

### b. The Double Jeopardy Clause of the Constitution Doesn't Render the Medical and Athletic Activities Evidence Inadmissible.

The motions before the Court don't concern the same sorts of questions considered and analyzed in classic issue preclusion cases like *Ashe*, *Yeager*, and *Coughlin*. Those cases dealt with whether issue preclusion foreclosed a retrial. Here, the D.C. Circuit has already given the green light to retrial—no one disputes that. Instead, Coughlin seeks to extend the issue preclusion doctrine described in *Ashe* and its progeny to require the exclusion of a great deal of relevant evidence in the upcoming retrial. But the Supreme Court rejected that very argument in *United States v. Dowling*, where it explicitly "decline[d] to extend *Ashe v. Swenson* and the Double Jeopardy Clause to exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted." *Dowling*, 493 U.S. at 348. As the Court will explain below, Coughlin's request simply can't be squared with *Dowling*.

## I. *Dowling*

The government prosecuted Dowling for armed bank robbery. *Id.* at 343. Witnesses had testified that the bank robbers had been masked. *Id.* at 344. The prosecutor sought to prove that Dowling, similarly masked and armed, had tried to rob Vena Henry's home two weeks later and had been unmasked and identified in the struggle. *Id.* at 344–45. The problem was that prior to the bank robbery trial, Dowling had been tried and acquitted of the house robbery. *Id.* He made an argument virtually identical to the one Coughlin urges upon the Court here, contending that the use in the second trial of Henry's testimony identifying him as the man who robbed her violated the Double Jeopardy Clause's issue preclusion doctrine. *Id.* at 347.

The Supreme Court held that the Double Jeopardy Clause didn't apply to the government's use of the house robbery evidence at the second trial because the relevance of evidence was governed by a lower standard of proof than that required for criminal conviction. *Dowling*, 493 U.S. at 348–49; *see also United States v. Felix*, 503 U.S. 378, 386 (1992) (explaining that the "collateral-estoppel component of the Double Jeopardy Clause offered Dowling no protection despite his earlier acquittal, because the relevance of evidence offered under Rule 404(b) was governed by a lower standard of proof than that required for conviction"); *id.* at 387 ("Underlying our approval of the Henry evidence in *Dowling* is an endorsement of the basic, yet important, principle that the introduction of relevant evidence of particular misconduct in a case is not the same thing as prosecution for that conduct."). The government had sought to introduce Henry's testimony under Federal Rule of Evidence 404(b) to strengthen its identification of Dowling as the bank robber, which only required it to be proved as a likelihood—not beyond a reasonable doubt. *Id.* Thus, the Court concluded, "Because a jury might reasonably conclude that Dowling was the masked man who entered Henry's home, even

if it did not believe beyond a reasonable doubt that Dowling committed the crimes charged at the first trial, the collateral-estoppel component of the Double Jeopardy Clause is inapposite." *Id.* at 349.

The same reasoning applies here.[1] The government doesn't have to prove beyond a reasonable doubt that Coughlin exaggerated the severity of his 9/11 injury or lied to VCF about his economic damages claims in order to introduce that evidence at the retrial. *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1970) (holding that no intermediate fact need be proved beyond a reasonable doubt, so long as the crime itself is proved beyond a reasonable doubt). As will be discussed at length below, it's not at all clear that the first jury rejected this evidence when it found that Coughlin lacked a fraudulent mail fraud scheme before May 2004. But even assuming it did, *Dowling* teaches that the Double Jeopardy Clause wouldn't apply here because a jury might *reasonably* conclude that Coughlin exaggerated the severity of his 9/11 injury or lied to the VCF about his economic damages claim, even if it didn't believe *beyond a reasonable doubt* that he had a fraudulent mail fraud scheme before May. *Dowling*, 493 U.S. at 349; *see also United States v. Felix*, 503 U.S. 378, 386 (1992) (explaining that the "collateral-estoppel component of the Double Jeopardy Clause offered Dowling no protection despite his earlier acquittal, because the relevance of evidence offered under Rule 404(b) was governed by a lower standard of proof than that required for conviction"); *id.* at 387 ("Underlying our approval of the Henry evidence in *Dowling* is an endorsement of the basic, yet important, principle that the

---

[1] The Court assumes for the moment that Coughlin's acquittals established that there was a reasonable doubt regarding whether he exaggerated the severity of his injuries or lied about his economic damages claims before May 2004. It actually isn't clear from the record that this finding formed the basis for the jury's verdict. For that reason—as will be explained at length below—even if the Double Jeopardy Clause did apply to Coughlin's claims, the evidence at issue would be admissible because Coughlin has failed to demonstrate that the issue he seeks to foreclose from relitigation was actually decided by the first jury. *Dowling v. United States*, 493 U.S. 342, 350 (1990).

introduction of relevant evidence of particular misconduct in a case is not the same thing as prosecution for that conduct.").

Coughlin objects to this line of reasoning, citing three cases for the proposition that "[c]ollateral estoppel under the Double Jeopardy clause may bar 'acquitted conduct' evidence." Resp. Government's Mot. Seeking Pre-trial Evidentiary Rulings 31, Mar. 25, 2011, ECF No. 136 (citing *United States v. Ginyard*, 511 F.3d 203, 210–11 (D.C. Cir. 2008); *United States v. Day*, 591 F.2d 861, 869 (D.C. Cir. 1978); *Green v. United States*, 426 F.2d 661, 662 (D.C. Cir. 1970)). This Court's research uncovered another case that recognizes that the Court of Appeals at one time "explicitly held that evidence that has been the subject of a count of which defendants have been acquitted in an earlier trial is inadmissible in a second trial under the doctrine of collateral estoppel." *United States v. Campbell*, 684 F.2d 141, 153–54 (D.C. Cir. 1982) (citing *Green*, 426 F.2d 661 and *Day*, 591 F.2d 861). Thus, Coughlin is correct that if this case had been decided in 1970, 1978, or even 1982, the Double Jeopardy Clause—as interpreted by the D.C. Circuit— would have at least *applied* to the questions at issue here. But decades have passed since then, and *Dowling* has fundamentally altered the issue preclusion landscape.

*Campbell*, *Day*, and *Green* were decided long before *Dowling*, and thus because they are directly contrary to the Supreme Court's ruling in that case, this Court declines to follow them.[2] Since *Dowling*, the D.C. Circuit has never reaffirmed the holdings of *Campbell*, *Day*, or *Green* that the Double Jeopardy Clause bars the admission of acquitted conduct evidence at a second trial. In fact, in the two cases to discuss the application of issue preclusion to the admissibility of acquitted conduct evidence, the D.C. Circuit has relied on *Dowling* to hold that the evidence is

---

[2] *Ginyard* was decided in 2008—long after *Dowling*—but it has absolutely nothing to do with the relevance of the issue preclusion analysis to evidence admissibility. Coughlin gave no explanation for his citation to *Ginyard*, and this Court finds it totally inapposite.

admissible. *United States v. Davis*, 235 Fed.Appx. 747, 749 (D.C. Cir. 2007) (relying on *Dowling* to reaffirm that the admission of acquitted conduct evidence doesn't violate the Double Jeopardy Clause) (per curiam); *see also United States v. Lukens*, 114 F.3d 1220, 1221 (D.C. Cir. 1997) (relying on *Dowling* to hold that the district court had not run afoul of the Double Jeopardy Clause's issue preclusion doctrine by admitting acquitted conduct evidence at Lukens' reprosecution). These D.C. Circuit decisions finding acquitted conduct evidence admissible in the face of an issue preclusion objection signal a clear rejection of the contrary holdings in *Campbell*, *Day*, and *Green*.

Indeed, no other court of appeals since *Dowling* has held that the Double Jeopardy Clause's issue preclusion doctrine bars the admission of acquitted conduct evidence. *See, e.g.*, *United States v. Bearden*, 265 F.3d 732, 736 (8th Cir. 2001) (holding that a prior acquittal on a charge of conspiracy to commit mail fraud didn't preclude the finding in a subsequent trial that defendant laundered proceeds of mail fraud); *United States v. Collazo-Aponte*, 216 F.3d 163, 199 (1st Cir. 2000) (holding that a prior acquittal of drug conspiracy didn't estop the government from introducing evidence in a subsequent prosecution for drug conspiracy and murder that defendant had associated with murder victims); *United States v. Brackett*, 113 F.3d 1396, 1400 (5th Cir. 1997) (holding that an acquittal on a substantive charge of possession with intent to distribute marijuana didn't bar admission of relevant facts in a subsequent prosecution for conspiracy to possess with intent to distribute); *United States v. Salerno*, 108 F.3d 730, 741 (7th Cir. 1997) (holding that a prior acquittal on RICO charge for extortion didn't bar the introduction of acquitted conduct evidence at the subsequent prosecution for a continuing criminal enterprise because the government wasn't required to prove that defendant ever extorted money from that person); *United States v. Gannon*, 967 F.2d 40, 45 (2d Cir. 1992) (holding that a prior acquittal

of conspiracy didn't estop the government from introducing evidence in a perjury prosecution even though the same evidence was admitted in the previous prosecution). Therefore, Coughlin's reliance on *Campbell*, *Day*, and *Green* is misplaced.

1. **Even if the Double Jeopardy Clause did apply here, the medical and athletic activities evidence would be admissible.**

As discussed above, *Dowling* teaches that the Double Jeopardy Clause doesn't apply here because admitting evidence of conduct into a second trial isn't the same thing as reprosecution for that conduct. 493 U.S. at 349; *see also Felix*, 503 U.S. at 387 ("Underlying our approval of the Henry evidence in *Dowling* is an endorsement of the basic, yet important, principle that that the introduction of relevant evidence of particular misconduct in a case is not the same thing as prosecution for that conduct."). But putting that aside and assuming for the moment that the Double Jeopardy Clause did apply here, close analysis makes clear that admitting this evidence would not amount to relitigating whether Coughlin had fraudulent intent for mail fraud purposes before May 2004.

The jury could have found that Coughlin had exaggerated the severity of his 9/11 injuries and lied to the VCF about his economic damages before May and still found that there was reasonable doubt regarding whether he had fraudulent intent for mail fraud purposes. As the D.C. Circuit made clear, fraudulent intent for mail fraud purposes requires proof that Coughlin had a fraudulent scheme and intended his mailing to promote that scheme. *Coughlin*, 610 F.3d at 97–98. Fraudulent intent for false claims and theft purposes, on the other hand, requires the government to show that Coughlin made a *false* claim. *Id.* at 101; *see also id.* at 105 n.7 ("We also note that, unlike the mail fraud statute, there is no 'scheme' requirement in the text of either the false claim or the theft statute."). The D.C. Circuit emphasized that whether Coughlin's

mailings actually contained a false statement was irrelevant for mail fraud purposes. *Id.* at 98–99 ("The law is clear that innocent mailings—ones that contain no false information—may supply the mailing element.") (citations and internal quotation marks omitted). Thus, the jury could have thought that Coughlin lied to the VCF several times both before and after May 1; it just didn't think that those lies—at the time of the charged mailings—proved beyond a reasonable doubt that Coughlin had a fraudulent scheme. *Id.* at 107 ("[The jury's] acquittals on mail fraud counts relating to dates before May 13 did not necessarily mean that Coughlin had made no false economic submissions before that date."). Therefore, the jury didn't *necessarily* decide that he hadn't lied before May, and introducing evidence that he did so wouldn't contradict any fact that the first jury necessarily decided.

Moreover, even if this Court assumes that the first jury necessarily rejected one or more of the government's arguments based on the medical and athletic activities evidence, it would still be impossible to say with certainty which of those arguments it rejected. For instance, as described above, it's possible that the jury unanimously accepted one or two of the government's arguments that Coughlin lied to the VCF, and still couldn't get unanimous consent to take the extra step of determining that—beyond a reasonable doubt—those lies were part of a fraudulent scheme. Because this Court could never know which of the government's arguments the jury *necessarily* accepted and which it rejected, it's impossible to know that it necessarily rejected any single one of the government's arguments. *Id.* at 97 ("The question is what the jury 'necessarily' decided.") (quoting *Yeager*, 129 S.Ct. at 2366); *see also id.* ("[T]here is no collateral estoppel if a different ground 'could' have been a rational basis for acquittal.") (quoting *Ashe*, 397 U.S. at 444).

To borrow a common metaphor, the evidence necessary to convict Coughlin can be likened to a brick wall. Each argument and piece of evidence the government put before the jury was a possible brick for the wall, and the wall was supposed to stack up beyond a reasonable doubt. The jury may have accepted several of those bricks, but after stacking them up, the wall just wasn't high enough to meet the beyond a reasonable doubt standard. The problem is that juries build these walls in the black box of the jury room, and their deliberations are intentionally secret and largely inaccessible to outsiders. For that reason, this Court can't know which bricks the jury chose to use for its wall and which it discarded as unworthy building material. Therefore, when the government comes back to the construction site for retrial—with the same load of bricks in tow—this Court can't say with certainty that the last jury necessarily rejected any single one of them.

This reasoning is particularly plausible in light of the instructions the jury received regarding materiality. As the D.C. Circuit recognized, the jury might not have considered any of the economic damages evidence—whether submitted before or after May 1—in deliberating over the acquitted mail fraud charges because that evidence was immaterial to those charges in light of the fact that before May, Coughlin hadn't made an economic damages claim. *Id.* at 107. Since much of the economic damages evidence was relevant to the mail fraud charges as well, it's impossible to tell which particular contentions the jury even considered, much less which ones it concluded were true or false. Moreover, because a jury doesn't need to be unanimous in its position on each individual piece of evidence as long as it is unanimous on its verdict regarding each of the elements of the crime, it's entirely possible that there was literally no unanimity regarding any individual piece of evidence at issue here. *Schad v. Arizona*, 501 U.S. 624 at 631–32 (1991) ("In this case as in litigation generally, 'different jurors may be persuaded by different

pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'") (quoting *McKoy v. North Carolina*, 494 U.S. 443, 449 (1990) (Blackman, J., concurring)). Therefore, admitting the medical and athletic activities evidence wouldn't violate the Double Jeopardy Clause even if it applied in this case.

The Supreme Court and the D.C. Circuit have both recognized the persuasiveness of this reasoning, holding that "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge . . . [T]he jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty." *United States v. Dozier*, 162 F.3d 120, 125 (D.C. Cir. 1998) (citing *United States v. Watts*, 519 U.S. 148 (1997)).[3] In *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), authorities had videotaped two transactions in which a defendant named Putra and a codefendant sold cocaine to a government informant. Putra was charged with a two-count indictment, was convicted of count one, and was acquitted of count two. *Id.* at 634. At sentencing, however, the district court found by a preponderance of the evidence that Putra had indeed been involved in the crime for which he was acquitted. *Id.* at 635. The Court of Appeals

---

[3] The Court recognizes that this language is in tension with the D.C. Circuit's formulation of the issue preclusion analysis in *Coughlin*. It said that the analysis boiled down to two questions: "What facts were necessarily decided by the jury's acquittals on Counts Two, Three, and Five? And, do those facts make up an essential element of the remaining counts?" *Coughlin*, 610 F.3d at 97. If "the jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty," *Dozier*, 162 F.3d at 125 (citing *Watts*, 519 U.S. 148), it's difficult to imagine how a court could ever determine what facts were necessarily decided by an acquittal. This Court notes that in *Ashe*, *Yeager*, and other issue preclusion cases, the Supreme Court referred to *issues* the jury necessarily decided as opposed to *facts*. *See, e.g.*, *Yeager*, 129 S.Ct. at 2366 ("In *Ashe*, we squarely held that the Double Jeopardy Clause precludes the Government from relitigating any *issue* that was necessarily decided by a jury's acquittal in a prior trial."). Perhaps this technical linguistic variance contains the source of the resolution of this tension, but this Court's reasoning is consistent both with the strict wording of the D.C. Circuit's opinion in *Coughlin* and with the Supreme Court's reasoning in *Watts*. Therefore, this Court has no occasion to address this potential tension.

vacated and remanded for resentencing. *Id.* It reasoned that the jury's verdict of acquittal

"manifested explicit rejection" of Putra's involvement in the acquitted crime. *Id.* (citations and

internal quotation marks omitted). Thus, "allowing an increase in Putra's sentence would be

effectively punishing her for an offense for which she has been acquitted." *Id.* (citations and

internal quotations marks omitted). The Supreme Court reversed this holding for several reasons,

one of which obliterates the basis of Coughlin's argument here:

> The Court of Appeals likewise *misunderstood the preclusive effect of an acquittal*, when it asserted that a jury "'reject[s]'" some facts when it returns a general verdict of not guilty. *Putra*, 78 F.3d, at 1389 (quoting *Brady*, *supra*, at 851). The Court of Appeals *failed to appreciate the significance of the different standards of proof* that govern at trial and sentencing. We have explained that "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984). As then-Chief Judge Wallace pointed out in his dissent in *Putra*, it is impossible to know exactly why a jury found a defendant not guilty on a certain charge.
>
> "[A]n acquittal is not a finding of any fact. An acquittal can only be an acknowledgement that the government failed to prove an essential element of the offense beyond a reasonable doubt. Without specific jury findings, no one can logically or realistically draw any factual finding inferences . . . ." 78 F.3d, at 1394.
>
> Thus, contrary to the Court of Appeals' assertion in *Brady*, *supra*, at 851, the jury cannot be said to have "necessarily rejected any facts when it returns a general verdict of not guilty.
>
> For these reasons, "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Dowling v. United States*, 493 U.S. 342, 349 (1990).

*Watts*, 519 U.S. at 155–56 (emphasis added).

The D.C. Circuit employed the same reasoning in *United States v. Dozier*, 162 F.3d 120

(D.C. Cir. 1998) (Garland, J.). A jury convicted Dozier of two weapons charges and acquitted

him of three drug-related charges. *Id.* at 121. At trial, a man named Shipp testified against

Dozier. *Id.* at 122. At the sentencing stage, the United States Probation Office prepared a presentence Investigation Report that calculated Dozier's sentencing range and recommended against a two-level decrease in the offense level for acceptance of responsibility. *Id.* It also recommended against a two-level increase in the offense level for obstructing or attempting to obstruct justice. *Id.* Dozier, naturally, opposed the increase and supported the decrease, and the government took the opposite position. *Id.*

At the sentencing hearing, Dozier's lawyer—arguing against the increase for obstruction of justice—contended that Dozier's acquittal on the drug charges showed that the jury didn't find Shipp's testimony credible. *Id.* The district court, however, made the following finding: "I think the government is right on that point . . . [Dozier] offered to pay Shipp several thousand dollars to tell the police that the gun belonged to Shipp. If that is not obstruction of justice, I don't know what is." *Id.* at 122–23. The district court responded to defense counsel's argument that the jury didn't find Shipp credible by saying "I understand you are saying . . . the jury didn't believe Shipp on that issue, but there is sufficient evidence here that that is what happened." *Id.* at 123.

Dozier made several challenges to the district court's decision to increase his sentence for obstruction of justice, but only one is critical to this case. He contended that the district court erred in crediting Shipp's testimony regarding the attempted obstruction, since the jury's acquittal of Dozier on the drug charges assertedly "demonstrated that it rejected Shipp's testimony that Dozier handed him the drugs, and thus indicated that the jury did not believe Shipp at all. The Court, Dozier suggest[ed], should have drawn the same conclusion." *Id.* at 125. The D.C. Circuit rejected that argument for three reasons:

> First, as the Supreme Court noted in *United States v. Watts*, 519 U.S. 148 (1997), "it is impossible to know exactly why a jury found a defendant not guilty on a

certain charge . . . [T]he jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty." Second, a jury may accept some parts of a witness' testimony and reject others, *see Parker v. United States*, 801 F.2d 1382, 1385–86 (D.C. Cir. 1986); even if the jury disbelieved Shipp with respect to ownership of the drugs, it may have believed him with respect to the attempted subornation. Third, even if the jury did not believe that Shipp's testimony established subornation beyond a reasonable doubt (an issue never put to it, since subornation was not one of the charges), "'an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof.'" *Watts*, 117 S.Ct. at 637 (quoting *Dowling v. United States*, 493 U.S. 342, 349 (1990)).

*Id.*

Coughlin's argument that this Court must construe his acquittals on the mail fraud counts as an affirmative finding by the jury that he never lied to the VCF or exaggerated his 9/11 injury before May 1, fails for the same reasons. The jury's acquittal merely means that there was a reasonable doubt as to whether Coughlin had fraudulent intent for mail fraud purposes before May. Beyond that, this Court can't determine anything else about what the jury necessarily decided. Therefore, even if the Double Jeopardy Clause applied here, the medical and athletic activities evidence would be admissible.

Coughlin might make two counter-arguments that the Court must consider. First, at oral argument before the Court of Appeals, Coughlin argued that, because the purpose of his April 30 mailing was to request a hearing on economic as well as non-economic damages, it is unlikely that the jury would have decided that he had no fraudulent intent on April 30 without also deciding that he lacked such intent on May 13. The Court of Appeals dismissed this argument as follows:

It is true that, by acquitting him of mail fraud on April 30, the jury decided that Coughlin's effort to obtain *some* compensation for economic loss was not—at that time—made in bad faith. But the government submitted evidence from which a jury could have found that *thereafter* he developed an intention to fraudulently overstate his economic losses.

*Coughlin*, 610 F.3d at 108 (first emphasis added; second emphasis in original).

Based on that language, Coughlin argues that the government may not use any pre-May 2004 medical and athletic activities evidence to show that he lied to the VCF or exaggerated the severity of his 9/11 injuries. As he puts it: "'Some' being less than 'all,' the Court's task on remand is to identify the portion of the May 14, 2004 economic damage claim that Cdr. Coughlin had already made by April 30, 2004. In the third trial, the Government cannot collaterally attack the first jury's determination that those components of the economic damage claim were legitimate." Resp. Government's Mot. Seeking Pre-trail Evidentiary Rulings 11, ECF No. 136. In short, because the D.C. Circuit held that "Coughlin's effort to obtain some compensation for economic loss was not—at that time—made in bad faith," Coughlin argues the jury necessarily found that *all* of his pre-May submissions were true and unexaggerated. *Coughlin*, 610 F.3d at 108.

Coughlin's interpretation of the D.C. Circuit's opinion would render it absurd. He contends that the Court of Appeals language quoted above means that the jury necessarily found that he made no false economic submission before May. Resp. Government's Mot. Seeking Pre-trial Evidentiary Rulings 11, ECF No. 136 ("[T]he Court's task on remand is to identify the portion of the May 14, 2004 economic damage claim that Cdr. Coughlin had already made by April 30, 2004. In the third trial, the Government cannot collaterally attack the first jury's determination that those components of the economic damage claim were legitimate."). But the Court of Appeals expressly stated on the prior page of its opinion that the jury's acquittals "did not necessarily mean that Coughlin made no false economic submissions before that date." *Coughlin*, 610 F.3d at 107. It would defy logic for the Court of Appeals to hold that Coughlin could have made a false economic submission before May and at the same time hold that he

necessarily hadn't made a false economic submission before May. The D.C. Circuit didn't contradict itself; Coughlin just misunderstood its opinion. Consistent with this Court's analysis above, when it said that "Coughlin's effort to obtain some compensation for economic loss was not—at that time—made in bad faith," it was merely indicating that the jury found reasonable doubt as to whether he had a fraudulent mail fraud scheme before May.

Coughlin's second possible counterargument attacks any reliance on the difference in the fraudulent intent standards of the statutes at issue here. Coughlin might argue that if this distinction is so important, the D.C. Circuit would have made the same argument to explain why retrial on Counts Six and Seven was constitutional. It's true that the D.C. Circuit's distinction was based on the possibility that the jury could have determined that Coughlin lacked fraudulent intent in seeking compensation for his physical injuries without also finding that he lacked fraudulent intent in seeking economic damages. *Id.* at 106 ("Although Coughlin is correct that '[t]he one and only Indictment allege[d] one and only one scheme,' that indictment alleged a scheme of many parts. Moreover, in alleging those parts, it drew the same kind of line that we draw here: the line between Coughlin's claims for physical injuries on the one hand and for economic injuries on the other."). Why then, Coughlin might ask, didn't the D.C. Circuit base its decision on the difference in the fraudulent intent standards as this Court does?

The answer is that this Court and the Court of Appeals face different questions. The D.C. Circuit only had to decide whether retrial was constitutional. This Court picks up where it left off to decide what evidence the government may use in light of the D.C. Circuit's findings. To decide that retrial was constitutional, the D.C. Circuit only needed to find that in acquitting Coughlin of mail fraud, the jury didn't necessarily decide that he lacked fraudulent intent for false claims and theft. To decide whether the medical and athletic activities evidence is

admissible, however, this Court must answer a much more specific question: In finding that Coughlin lacked fraudulent for mail fraud purposes before May 2004, did the jury necessarily determine that Coughlin never lied to the VCF or exaggerated the severity of his 9/11 injuries before May? It is this more specific question that requires a probing analysis of specifically what a finding of no fraudulent intent for mail fraud purposes means.

For all these reasons, this Court concludes that it would work a manifest injustice to allow this Court's January 27, 2011 ruling to stand. Having reconsidered that ruling in light of the parties briefing and this Court's own extensive research, the Court now holds that the Double Jeopardy Clause doesn't bar the medical and athletic activities evidence at issue in this case. The Court proceeds to consider the parties' many other motions and arguments.[4]

### c. Checks Coughlin Submitted to the VCF before May 2004

In his Motion in Limine, Coughlin argues that certain checks he listed in his January 22, 2004 submission to the VCF aren't admissible at the upcoming retrial for precisely the same reason he argued that the medical and athletic activities evidence is inadmissible. Mot. Limine 8–9, ECF No.121. The government wants to use them because although Coughlin did submit them with his January 22, 2004 submission, he also resubmitted them with his May 13, 2004 economic damages claim. The government argues that the submitted check carbons didn't match the checks as deposited or that they were otherwise misleading. Mot. Limine 8, ECF No.121.

---

[4] At the January 27, 2011 hearing, after this Court ruled that the medical and athletic activities evidence was inadmissible, the government asked whether it could impeach Coughlin with that evidence if he took the stand. This Court asked for additional briefing on that point. In light of its decision to reconsider its January 27 ruling and to allow the medical and athletic activities evidence at retrial, however, the impeachment issue is now moot. Therefore, if Coughlin chooses to testify at the upcoming retrial, the government may impeach him with any evidence and in any manner allowed under the Federal Rules, and it may do so with the medical and athletic activities evidence.

Coughlin argues that because these checks were listed in his pre-May 2004 VCF submission, the jury's acquittals indicated that it necessarily decided that the government was wrong to infer any fraudulent intent from the mismatched check carbons or other indications of deception related to those checks. Mot. Limine 8–9, ECF No. 121. Therefore, allowing the checks to be challenged in any way would undermine what the first jury necessarily decided.

At the January 27, 2011 hearing, Judge Kennedy ruled these checks are inadmissible because "the amount which is subject to litigation does not include the amount of those checks." Hr'g Tr. 25, Jan. 27, 2011. The Court went on to explain, though, that the checks "can be challenged to the extent that what is being shown is that the checks were written for services not actually purchased or were a different amount," but the government may not challenge that "such services were needed because Commander Coughlin could not perform them." *Id.* at 31.

Coughlin argues that Judge Kennedy was wrong to hold that the replacement-cost checks submitted in his January 22, 2004 mailing "can be challenged to the extent that what is being shown is that the checks were written for services not actually purchased or were a different amount." Resp. Government's Mot. Seeking Pre-trial Evidentiary Rulings 60, ECF No. 136 (quoting Hr'g. Tr. 31, Jan. 27, 2011). He reiterates his argument that because these checks were submitted both before and after the critical April 30, 2004 date, the first jury's finding that he necessarily lacked fraudulent intent before May 2004 creates a sort of double jeopardy force field around them, and to allow the government to attack them would "inject[ ] <u>constitutional</u> error into his third trial, giving rise to a clear possibility of a fourth trial in the event of a conviction." Resp. Government's Mot. Seeking Pre-trial Evidentiary Rulings 64, ECF No. 136 (emphasis in original). For the same reasons this Court rejected this argument as applied to the medical and athletic activities evidence, it rejects it here regarding the replacement-cost checks. The Double

Jeopardy Clause doesn't apply to this argument in light of *Dowling*, and even if it did apply,

Coughlin has failed to prove that the first jury necessarily decided this issue in his favor.

For thoroughness' sake, this Court pauses to highlight the fact that the D.C. Circuit

explicitly rejected this very same argument in its opinion. The Court quotes that analysis in full:

> Coughlin further argues that the jury could not have distinguished the pre- and post-April 30 evidence in the way the government suggests. Although the indictment charged that on May 13 he submitted altered copies of 'checks to support a claim for replacement cost of household services for his reduced physical abilities,' Coughlin argues that 'the May 13 hearing was not the first time that [he] made this claim.' Rather, his January 22, 2004 application likewise listed such replacement services—albeit, in a lesser amount and without the supporting check carbons that the government maintained he subsequently altered.
>
> The problem with this argument is that, although the January application did state that Coughlin had paid for replacement services, it made clear that he was *not* making a claim for such economic losses. Rather, at that time his 'claim [wa]s for the personal injuries that he suffered'—for which he sought $180,000. Indeed, as Coughlin's attorney later told the hearing officer, that was the case until May 13. Accordingly, Coughlin's January replacement-cost submissions were not material to his claim at that time. And because the jury was repeatedly and correctly advised that only 'material' misrepresentations were relevant, its acquittals on mail fraud counts relating to dates before May 13 did not necessarily mean that Coughlin had made no false economic submissions before that date.

*Coughlin*, 610 F.3d at 107 (citations omitted). Therefore, the jury didn't necessarily draw any

conclusions about Coughlin's pre-May economic damages submissions, and the replacement-

cost checks are fair game for the impending retrial.

### d. Other Challenges to the Medical, Athletic Activities, and Replacement-Cost Checks Evidence.
#### I. The Challenged Evidence is Admissible Under Rules 401, 402, and 403.

Coughlin argues that even if the Double Jeopardy Clause doesn't render this evidence

inadmissible, it is irrelevant under Rules 401 and 402 and inadmissible under Rule 403. Mot.

Limine 14–18, ECF No. 121.This Court finds each of his arguments unpersuasive and, for the reasons explained below, concludes that the evidence at issue is admissible.

The cardinal principle of admissibility is that evidence must be relevant, meaning that it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. Coughlin points out that the government has the D.C. Circuit's approval to retry him on the limited theory that "through April 2004, Coughlin sought only compensation to which he believed he was entitled . . ., that he had been *physically* injured in the attack on the Pentagon and that, through April, he was only seeking compensation for such physical injuries in good faith." *Coughlin*, 610 F.3d at 102 (emphasis in original). Thus, he argues, his pre-May 2004 good faith, or lack thereof, is no longer a variable that may be proved to be more or less probable. Mot. Limine 15, ECF No. 121.

The problem with Coughlin's argument is that although it's no longer relevant whether he had a fraudulent scheme for mail fraud purposes before May 2004, it is still relevant whether he exaggerated the severity of his 9/11 injury in order to inflate his post-May economic damages claim. His medical records and post-9/11 athletic activities are clearly relevant to that issue. As long as the government doesn't argue that Coughlin wasn't injured at all on 9/11, it may introduce evidence that he exaggerated the severity of his injuries or that he failed to disclose his other injuries that might have contributed to his current disability.

Coughlin also argues that even if the evidence is relevant, it should be excluded because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Coughlin argues that "[i]f the Government were to attempt to introduce evidence in this third trial . . . tending to dispute Cdr. Coughlin's account of what happened to him on 9/11, and what he believed concerning the extent of his injuries and limitations resulting therefrom, this case would break down into a trial-within-a-trial of issues that already have been conclusively established against the Government." Mot. Limine 16, ECF No. 121. He also argues that this evidence would confuse the jury because its role is limited to determining "whether, after April 30, 2004, Cdr. Coughlin developed and executed a new, narrow scheme to inflate his economic claim to the VCF. To suggest to the jury that it may consider and weigh alternative causes of Cdr. Coughlin's deteriorating physical condition and abilities, or the extent of such deterioration, would be to lead the jury down a path that has been rejected by the first jury and the Court of Appeals—the path impugning Cdr. Coughlin's pre-May 2004 intent." Mot. Limine 16, ECF No. 121.

Those arguments also fail. His argument that there is a risk of creating a trial-within-a-trial fails because it is premised on the already-rejected assumption that these are issues "that already have been conclusively established against the Government." Mot. Limine 16, ECF No. 121. That's flat wrong. As was described at length above, it's impossible to know precisely what the jury decided regarding the severity of Coughlin's 9/11 injuries based solely on its determination that he lacked a fraudulent mail fraud scheme before May 2004. To the extent that this evidence increases the length of the trial, it does so only because the jury has to determine whether Coughlin exaggerated the extent of his 9/11 injuries in order to decide whether he made false economic damages claims or stole public money. This evidence is all central to that determination; it wasn't necessarily decided by the first jury; and its probative value is certainly

not substantially outweighed by any of the Rule 403 considerations. Coughlin's argument that this evidence would confuse the jury fails for precisely the same reasons.

### e.   Whether evidence of the VCF's economic award process, analysis, and models is inadmissible at the upcoming retrial.

Before the first trial, Coughlin moved in limine for an order prohibiting the government from presenting testimony from the VCF hearing officer, Glenn MacLeod, and other VCF officers acting in a quasi-judicial capacity, regarding their mental processes in making their determinations regarding his claim. *See* Valuation Models, Mar. 21, 2011, ECF No. 133–2. He cited authority that testimony from a judge, or a person acting in a quasi-judicial role, regarding his or her judicial decision-making is not permitted except in the exceptional circumstance where the officer's testimony is the only source of the evidence in question. *See, e.g.*, *United States v. Frankelthal*, 582 F.2d 1102, 1108 (7th Cir. 1978).

The Court granted Coughlin's motion but also ordered that he couldn't seek to introduce into evidence matters within the VCF record concerning the methodology by which the economic damages awards were calculated. Coughlin wants this Court to reconsider its decision not to allow the VCF's valuation models into evidence. Mot. Limine 27–29, ECF No. 121. He argues that because the VCF officers used these valuation models to calculate his economic damages and those models don't include very many of his economic submissions, they demonstrate that virtually all of the evidence he submitted to the VCF was immaterial to its decision regarding the amount of his economic damages. Mot. Limine 28, ECF No. 121.

This Court rejects that argument because admitting the valuation tables into evidence would almost certainly mislead and confuse the jury. The ultimate decision regarding the amount of Coughlin's economic damages award was left to the discretion of the Special Master—not to

the mechanical application of a valuation model. The fact that some of the documents he used to calculate that number didn't reflect Coughlin's economic damages submissions doesn't necessarily mean that the Special Master didn't take those submissions into account in calculating the award. If the jury were to see the valuation model without the critical context of the VCF officer's testimony to explain how those models were used to arrive at the final economic damages award figures, it would very likely fail to appreciate the role of the Special Master's discretion in the process. Fed. R. Evid. 403. Therefore, Judge Kennedy's rulings stand regarding the testimony of the VCF officers and the VCF valuation models.

Additionally, the VCF officers' valuation tables aren't admissible under Rule 803(8)(C), which permits a defendant in a criminal case to admit into evidence "factual findings resulting from an investigation made pursuant to authority granted by law." The valuation tables were tools used to make factual findings, not the findings themselves. The Special Master made the only factual findings that would be admissible under Rule 803(8)(C). Therefore, the valuation tables are inadmissible at the upcoming retrial.

### f. The VCF Claim File is admissible

The government has made clear that it doesn't intend to offer any pre-hearing statements Coughlin made to the VCF into evidence, but it anticipates that Coughlin will seek to admit that evidence through government witnesses during his case. Government's Supplemental Mot. Seeking Pre-trial Evidentiary Rulings 16, ECF No. 132. It argues that it is allowed to offer such evidence as admissions of a party opponent, but Coughlin may not offer them because they are hearsay and should be excluded under Rule 801(c). Government's Supplemental Mot. Seeking Pre-trial Evidentiary Rulings 16, ECF No. 132.

The government also claims that this evidence is irrelevant and that even if it is relevant, its probative value is substantially outweighed by its tendency to unduly prejudice the government. Fed. R. Ev. 403. As the government puts it: "The horrific events of 9/11 are more than likely inscribed in the memories of all those who will be impaneled as jurors in this case. Allowing the defendant to repeatedly highlight those events is unfair, especially where defendant is seeking to preclude the government from challenging the veracity of those statements." Government's Supplemental Mot. Seeking Pre-trial Evidentiary Rulings 17, ECF No. 132.

The Court will defer ruling on the hearsay question if and until it is raised at trial because it depends on how Coughlin attempts to use the evidence. Coughlin is correct, however, that regardless of whether this evidence is inadmissible hearsay or not, he can introduce it under the rule of completeness. Resp. Government's Mot. Seeking Pre-trial Evidentiary Rulings 28, ECF No. 136. "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Fed. R. Evid. 106. "The application of the rule of completeness is a matter for the trial judge's discretion." *United States v. Washington*, 12 F.3d 1128, 1137–38 (D.C. Cir. 1994). The Court of Appeals has construed Rule 106 broadly, even permitting "admission of some otherwise inadmissible evidence when the court finds in fairness that the proffered evidence should be considered contemporaneously." *United States v. Sutton*, 801 F.2d 1346, 1368 (D.C. Cir. 1986).

The government has insisted that it be allowed to reach back before May 2004 to highlight several other aspects of Coughlin's claim. Coughlin, in fairness, ought to be allowed to put the rest of his claim file into evidence so that the jury will see everything the VCF officers saw when they calculated his economic damages award. The hearing officer made it clear that he

reviewed Coughlin's "entire file." Track A Award Appeal Hr'g Tr. at VCF-2-0055, Mar. 21, 2011, ECF No. 133–6. The jury should be able to do the same. The fact that this case involves the horrific events of 9/11 is an inevitable consequence of Congress's creation of the 9/11 Victim's Compensation Fund. To understand the nature of Coughlin's claim—and the full deplorability of his false claim and theft if it's proven—the jury must be given the full story.

_____/s/_____          July 6, 2011
ROYCE C. LAMBERTH                     Date
Chief Judge
United States District Court

<h1 style="text-align:center">Appendix to Memorandum Opinion</h1>

**The Evidence at Issue**

    **1. Medical Evidence**

The Court assumes that the medical and athletic activities evidence the government intends to offer at the upcoming retrial will be all or part of the medical and athletic activities evidence that it offered at the first two trials. It summarizes that evidence and how the government will likely try to implement it at the upcoming retrial below.

At the first trial, the government called five doctors—Drs. William Morgan, Christopher Zukowski, Harry Friedman, Kevin Murphy, and Robert Rosenbaum—to attack Coughlin's representations to the VCF regarding his neck injury and disability resulting from the 9/11 attacks. Trial Tr., June 11, 2009, ECF No. 115 (Morgan, Zkowski); 6/16/2009 Tr. (Zukowski, Friedman); 6/24/2009 Tr. (Murphy); 6/29/2009 Tr. (Rosenbaum). The government also offered Coughlin's pre- and post-May 13, 2004 medical records, as well as two demonstrative videos of surgical procedures shown and explained to the jury by a physician.

The government also introduced extensive evidence of Coughlin's athletic activities—basketball, running, and lacrosse—through Joseph Avedduti, James Schraf, and Agent Joseph Barlow. 6/25/2009 Tr. (Schraf); 6/29/2009 Tr. (Barlow); 6/30/2009 Tr. (Barlow); 3/19 (2009) (Avedduti). The government introduced this evidence to establish that Coughlin knew that he sustained no injury on 9/11; that his February 3, 2004 mailing to the VCF misrepresented the impact of the 9/11 events on his athletic activities; and to undermine his economic damages claims related to his inability to perform household chores as a result of 9/11.

It presented evidence that at the May 13, 2004 VCF hearing, Coughlin submitted check carbons that didn't match the checks as deposited or that otherwise were false or misleading. As part of his January 22, 2004 VCF application materials, Coughlin submitted a list of eleven checks for replacement costs. Ex. VCF-1-0051. The government called William Biggins, an employee of Home Goods, to testify regarding a $154.30 check made out to Home Goods. The carbon of that check, as submitted to the VCF, had a notation for "Hanging Mirror & Pantry Shelves (Services Only)." Ex. VCF-3-0042. Coughlin had already listed that check in his January 22, 2004 submission. Ex. VCF-1-0051. Diane Eickman of the U.S. Attorney's Office testified to several other checks as well, many of which Coughlin submitted both on January 22, 2004 and at the May 13, 2004 hearing. *Compare* Ex. VCF-1-0051, *with*, *e.g.*, 7/1/2009 Tr. at 21 (Ex. VCF-3-0031), 26 (Ex. VCF-3-0032), 29 (Ex. VCF-3-0032), 31 (Ex. VCF-3-0029), 32 (Ex. VCF-3-0027), 33–34 (Ex. VCF-3-0042), 38–39 (Ex. VCF-3-0038), 42–43 (Ex. VCF-3-0034), 51–52 (Ex. VCF-3-0038, VCF-3-0062).

At the May 13, 2004 VCF hearing, Coughlin sought economic damages for lost wages he incurred or would incur to attend medical appointments relating to his neck injury and for replacement services for physical chores he could no longer perform as a result of this ailment. In support of these damages, he offered into evidence a letter signed by his employer, John Sayres, detailing the past and present losses. Gov't Ex. VCF-3 at 2. In a summary exhibit he offered at the hearing, Coughlin stated that he used forty-two hours in 2003 and twenty-eight hours in 2004 of sick and vacation leave, respectively, to attend medical appointments for a total loss of $7,031.25. Gov't Ex. VCF-3 at 61.

Regarding future economic losses, Coughlin estimated that he would need to see a doctor four times a year and a chiropractor two to three times per month. Gov't Ex. VCF-2 at 37. In

calculating the amount of loss for these appointments, Coughlin included two hours for driving ninety-eight miles, twenty minutes for walking back and forth from the parking lot to the medical office, fifteen minutes for waiting, and thirty minutes for the session. Gov't Ex. VCF-3 at 63. In total, Coughlin estimated that he would incur $7,959.26 in lost earnings per year. *Id.* He also included a one-time loss of earning calculation of $25,001 for work he would miss when he eventually required surgery. *Id.* According to Coughlin, his latest MRI in April 2003 revealed an "increase in the severity or a decrease in the health of that area of my neck." Gov't Ex. VCF-2 at 23. The examining doctor told him that he would require surgery for the condition. The doctor's prediction "was very similar to the doctor that [he] had seen earlier in 2001: It's not a question of if; it's a matter of when [he would require surgery]." *Id.* at 23–24. Since his employer didn't have a disability policy, Coughlin told the hearing officer that he would be forced to take leave without pay during a two-month recuperation period. Gov't Ex. VCF-2 at 23–24; *id.* at 7–8. The employer letter confirmed that "when he elects to have surgery Mr. Coughlin will be required to use his company authorized time-off (benefits) to seek medical services with the difference taken as 'leave without pay.'" Gov't Ex. VCF-3 at 2.

The government argues that Coughlin's medical records and the testimony of several treating physicians contradicted his loss of earnings calculations. ECF 122 at 10. According to his complete Navy medical file, Coughlin attended five appointments in 2003 during which his neck injury was mentioned. There were none in 2004. Gov't Ex. Medical Records 1. There was also no evidence in the medical records to support Coughlin's claim that he would need surgery.

Dr. Friedman was the only neurosurgeon who evaluated and treated Coughlin post-9/11 and before the May 13, 2004 hearing. He testified at the second trial that he examined Coughlin in April 2003. Based upon Coughlin's description of his symptoms and self-report that the

medication and chiropractic treatments had reduced the pain and increased his range of motion, Dr. Friedman didn't believe that "surgery was going to be . . . coming up anytime soon." 6/16/2009 Tr. at 124. In fact, Dr. Freidman explained to the jury that less than ten percent of the patients he sees with the same condition ultimately require surgery. *Id.* at 125. When asked if he ever told Coughlin that he would definitely require surgery for this condition, Dr. Friedman testified as follows:

> Based on what I've written here, I don't think I would have told him that. And I can't remember, you know, that long ago all the details of our conversation, but as I say, given the way I wrote my note, I don't think that would be something I would have said.

*Id.* at 133. When asked why he didn't think he would have told Coughlin he would require surgery, Dr. Friedman explained that :

> the hope would be that over time that he would not develop symptoms serious enough to require surgery. That's not to say he might not, I mean, he could. But I didn't see anything, given his history of coming and going, coming and going. I was hoping that that's the way it would be. There's no—nothing that told me for sure that he was absolutely going to have to have surgery.

*Id.* Finally, on redirect examination, Dr. Friedman denied the ability to foresee what changes may occur to Coughlin's neck in the future: "there's a good chance he could have recurrent symptoms. How bad they would be I have no way of knowing." *Id.* at 149.

In addition to the loss of earnings component, Coughlin testified and presented exhibits to demonstrate that he was no longer able to perform household tasks as a result of the injuries he sustained on 9/11. The chores included some relatively simple tasks, such as hanging mirrors and Christmas lights, washing windows, spreading mulch, and cleaning the gutters. To prove his physical limitations, and thus increase the damages award, Coughlin described his medical condition to the hearing officer as follows:

> I always have a decreased sensitivity and a numbness and the constant pain up in the neck area. By raising my arm and holding it in this type position for a maybe five minutes, I start getting an increase in numbness, to the point where it's actually starting to feel asleep; and I also start getting increased tension and pain up in the neck area.

Gov't Ex. VCF-2 at 21. Coughlin told the hearing officer that since 9/11, he has taken prescription ibuprofen (800 milligrams) three times a day to deal with this pain. *Id.* at 22. Coughlin testified that without the medication:

> All the symptoms increase and I risk more going into spasmodic episodes, both in the neck and in the left lat area, which is all a direct result of the C5-C6 nerve damage or interaction in the cervical area.

*Id.*

The government argues, though, that his medical records before and after the May 13 hearing contain markedly different descriptions of his medical condition. ECF 122 at 12. In September 2003, Coughlin described his condition as "a slight pinched nerve," resulting in "slight weakness" in his left tricep and latisimus area and numbness in his left hand vicinity between the thumb and forefinger. Gov't Ex. Medical Records-1 at 133; *id.* at 173. The government also points out that Coughlin didn't see any medical physicians for his neck injury following the VCF May 2004 hearing until August 2007—two months after he learned that he was under criminal investigation for defrauding the government. *Id.* at 209–11.

The government also seeks to undercut Coughlin's claims that he was dependent on prescription ibuprofen. ECF 122 at 12. It argues that his medical records tell a different story. Gov't Ex. Medical Records-1 at 66–68 (Coughlin reported to physical therapist and chiropractor in February and March 2002 that he was only taking one Motrin per day). Orthopedic surgeon Kevin Murphy noted in the second trial that Coughlin didn't list pain medication on the anesthesiology screening form prior to his September 2003 hip surgery, but he did list allergy

medications. *Id.* at 134. According to Dr. Murphy, anesthesiologists need to know about all medicines a patient is taking because "the medicines that they give them during anesthesia could interact with medicines they're taking at home." 6/24/2009 Tr. at 76. The government also wants to use Coughlin's medical records to show that he suffered from other, arguably more severe, orthopedic conditions and that Coughlin didn't disclose those conditions to the VCF hearing officer. ECF 122 at 13.

### 2. Post-9/11 Athletic Activities Evidence

During the May 13, 2004 hearing, Coughlin presented evidence that prior to 9/11, he was in optimal physical condition. In response to his attorney's questions, Coughlin informed the hearing officer that, in December 1998, he started training to run marathons. VCF-2 at 20. He ran the B&A Trail Marathon in March 1999 in an impressive three hours eleven minutes. *Id.* He testified about running the New York City Marathon and the Boston Marathon as well—all in very impressive times. *Id.* After describing the 2000 Boston Marathon, Coughlin shifted his testimony to his current physical condition, indicating that his athletic activity had changed since 9/11: "These days, one of the reasons why I'm now sitting with my arm off the armchair is that holding it for any period of time starts to increase the symptoms that I experience." *Id.* at 20–21.

To corroborate the decline in his athletic performance, Coughlin offered a letter signed by Navy Chief Petty Officer William hook and his wife's testimony. In the letter, Hook wrote that he saw "a remarkable difference in his ability, stamina, and strength." VCF 3 at 1. According to Hook, "it is a rare occasion that [Coughlin] attempts to compete athletically and then only for brief periods." *Id.* Sabrina Coughlin described how her husband would "always" be "out there

playing basketball, lacrosse with the kids, pushing them to do better." VCF-2 at 48. She testified

that after 9/11, however, her husband's playing days were "absolutely" over. *Id.* at 49.

Coughlin also gave the hearing officer more detailed descriptions of his physical

limitations, including:

> to hold anything away from my body. Straight down is not as much of a problem,
> but once there's something that has bulk, that requires the arm to go out, it
> becomes increasingly difficult as the weight increases. And then anything that
> puts my arms over my head for longer than a minute or so, I get a lot more severe
> than even with the armrest.

VCF-2 at 34.  She provided examples of activities could no longer do: helping their son move

into his college dorm, carrying his youngest daughter up the stairs, carrying the Christmas tree

into the house, or putting the decorating lights on the Christmas tree. *Id.* at 47.

The government argues that its athletic activities evidence contradicts Coughlin's claims

about his limited physical abilities. ECF 122 at 14. It seeks to show that Coughlin ran the New

York City Marathon in November 2001—less than two months after allegedly sustaining serious

injuries at the Pentagon—successfully completing the race in three hours forty-three minutes. He

also continued to play lacrosse. Computer evidence obtained from his work computers, including

Coughlin's e-mail communications and electronic calendar, and records from two lacrosse

teams—the Navy Old Goats and the Geezers—show that he regularly played lacrosse before,

during and after the filing of his VCF claim. Govt' Ex. Geezers 1-13; Work Computer 12, 26,

34, 35, 37–42. Photographs from a yearly tournament in Vail, Colorado, included several of

Coughlin playing lacrosse for the Navy Old Goats in full gear, cradling on both his left and right

sides. Gov't Ex. Vail 5-13. In fact, the 2004 lacrosse tournament took place just six weeks after

the VCF hearing. The Navy Old Goats' score sheets list Coughlin playing in at least four games.

Gov't Ex. Vail 4. Airline reservation confirmations show that Sabrina Coughlin traveled with her husband to this tournament. Gov't Ex. Work Computer 51.

The government also seeks to prove that Coughlin continued to compete on the basketball court after 9/11. ECF 122 at 15. His medical records contain entries for injuries he incurred while doing so. Medical Records 1 at 67–69 (dislocated finger on 12/19/2009); 94 (injured left ankle in early March 2003). Coughlin's medical records reflect that he continued to play basketball straight through September 2007. Medical Records 1 at 224 (habits include exercising regularly two to three times per week and playing basketball).